All right, welcome to the Fifth Circuit. A little bit different setup today. Judge Graves had to be called back to Mississippi, but he is graciously participating by video. Judge Graves, can you hear us? Can you see us? I can hear you, and I can see the audience, and I can see counsel. Oh, okay. You can't see me, though. Okay, thanks for being specific. And Judge Graves has asked yours truly to preside, and so you have the backup presider today. So that'll be fun. All right, so we will see after a couple of arguments whether we're going to take a break or not. And with that, we'll call the first case, number 24-50836, Sarah Shannon v. The Allstate Corporation. Mr. Coon. Good morning. Good morning. May it please the Court. This is an insurance discrimination case challenging Allstate's practice of charging some policyholders more for the same coverage based on predicted willingness to pay, despite the fact there being no risk-based or cost-based reasoning for doing so. The district court denied class certification and granted summary judgment for two main reasons. First, it misapplied the filed rate doctrine, believing that the claims were barred simply because they involved filed rates. Second, it accepted Allstate's misguided approach that would require each plaintiff to prove in trying a case a material identical comparator policyholder. I'd like to talk about both these errors, which, if the law would bar discrimination claims.  So first, on the filed rate doctrine, neither the district court nor Allstate point to any case that has ever applied the filed rate doctrine to bar a discrimination claim. And that's because it simply does not apply. The filed rate doctrine, the entire purpose of it is to prevent discrimination in filed rates. Can you just hold on one second? I don't see the time going down for Mr. Coon. All right, that's fine. I'm sorry to interrupt you, but you guys have got a half o'clock. I appreciate it. In Keogh, the case that is cited traditionally as the origins of the They created the doctrine because they were dealing with what they called uniform rates. The idea was the same rate had to apply to all shippers. And the filed rate doctrine was necessary because if you allowed the claim to be brought, it would allow the plaintiffs to obtain a lower rate than otherwise charged. Now, courts have repeatedly held that the filed rate doctrine does not bar a discrimination claim. There's, in our briefing, you'll see the Eighth Circuit's Saunders case, the Western District of Tennessee's Lampkin that cites one of this court's cases, the Perez case out of Arizona that dealt with insurance, title insurance. There's the Lanz case that dealt with the difference in policies for men and women in Louisiana, I'm sorry, in Arizona. And this court's case, which I think is probably one of the most interesting cases for purposes of our case, is the In Re Monumental Life Insurance. And in that case, the court reversed denial of a class certification where it involved claims that the insurers over decades had given worse premiums and worse benefits to minorities over Caucasians in life insurance policies. Now, the cases that all state relies on and the district court relied on, those are all cases where they are attacking the reasonableness of the rate. Now, in Winn, that was a, the plaintiffs brought an antitrust and deceptive trade practices act claiming that the insurance that they got was too high because of a kickback scheme, right? And in it, what the court said was the rate that was charged, the amount charged was the amount that had been signed off on by the commissioner of insurance, and it was the rate that had to be charged. So therefore, the filed rate doctrine applied. The other main case they look at is the court case, and that was the plaintiffs had filed this out of the Eastern District of Tennessee. And in that case, they filed a breach of contract fraud, negligence, and consumer protection claim arguing about a fee that was added to their standard insurance policies to help support the risk pool. And the court said that standard fee, which everyone knew about, it was approved by the, by the Department of Insurance, you couldn't challenge that because if you did so, you would, you're essentially challenged the reasonableness of the approved rate. That approach is consistent with the nondiscrimination and non-justice really principles of the filed rate doctrine. They don't apply to a discrimination case, which is what we are arguing here because our clients do not seek to get a lower rate than anyone else. What we're seeking in a discrimination claim is to get the same rate being charged to everyone for the same services. Now, I know in the briefing, there was a lot of back and forth about what the department was told. And I do want to say, I don't think you need to reach any of that. Now, we strongly believe they were never told, including any things they pointed out on appeal, that there was, they were using willingness to pay as a factor. So, if I could just follow up on that, what, so, okay, you say it doesn't matter what they did or did not know, but in your view, what did they not know? The TDI? They didn't know they were using an internal retention policy based upon, to set the premium based on willingness to pay. Okay. They were never told that. And they didn't know that the standard, that the approved SMR for file rate doctrine wasn't being used to set the premium. They were only told that in 2020 after this lawsuit was filed. Okay. But the reason I say you don't need to know it and you don't need to decide that issue is the Supreme Court has two cases, Maislin and Arkansas-Louisiana Gas. If you look at those two cases, the question in them was, I mean, whether or not the regulator approved the rate, does it matter for discrimination claim? And in Maislin, the Supreme Court rejected the ICC's negotiated rate policy. So, what the ICC had done was said, if you guys negotiate a rate that's lower than the file rate, we think in fairness, we should enforce the negotiated rate. So, we're not going to order you to pay the file rate. And the Supreme Court said they rejected that policy that the ICC created. And it said that the ICC generally had authority to adopt policies. It did not have the power to adopt a policy that would directly conflict with the governing statute. Now, if you look at Arkansas-Louisiana Gas, which was an earlier decision, but had the same idea, in that case, they were approved contracts, they were gas contracts, and they included a favored nations clause. And the regulator had approved the contract. And the question was, on a breach of contract, could you get damages based upon the approved favored nation clause? And the court again said, you can't do it because what you're trying to do there is you're trying to get them to enforce the very discrimination that the doctrine is meant to preclude. So, even if they knew in this case that this is how they were setting up the practice, it still wouldn't bar discrimination claim. Why is that? Well, Texas specifically bars these types of discriminatory practices. And it would be a misapplication of the filed rate doctrine to prevent them from bringing the very act, the very kind of discrimination claim that the legislature created. Now, what's the evidence, counsel, what's the evidence that they were engaging in a discriminatory practice? I don't think it's even disputed, Your Honor. I mean, what they did in this case was they used, and we have plenty of evidence from the side of the record, they used a retention model. So, what they would do is for each renewal period, they would create a range of rates that were available for every single renewal. And then they had this internal retention model that they would then apply. And they would determine based on willingness to pay, which they admit is not a cost or risk big factor, what your actual premium would be. So, they admit, basically, someone who was less willing to pay, they would charge less to. Counsel, you're not disputing that Texas law has adopted some type of filed rate doctrine which prevents courts from entering into the regulatory rate procedure. Right, Your Honor. We're not disputing that. No, we're not disputing it at all. What we're saying is that doesn't apply to a discrimination claim. A discrimination claim doesn't violate the filed rate doctrine. And you must concede or recognize that this Court, the Fifth Circuit, applying Texas law, has recognized the filed rate doctrine and its application in Texas. That's right, Your Honor. We don't dispute the filed rate doctrine. And if we were here arguing about the reasonableness of the rate or what the rate was set at, our claim would be barred. If we were arguing that the insurance rates were too high. How can you not recognize that under Texas law, which has adopted the filed rate doctrine from the federal jurisprudence, that under that doctrine, courts can't get involved in rate making? And therefore, it doesn't matter whether, in other words, your argument that since this is a discrimination case and not an equal protection case or whatever, that it's different and the Texas courts can get involved in the reasonable rate making. Seems to me that's just flat contrary to the idea that the filed rate doctrine prevents any entry into the regulatory area. Your Honor, this is, I'm sorry, it was, I'm sorry, Your Honor, I didn't mean to cut you off. Go ahead. This is the same claim, I mean, in In Re Monumental Life, if you look at footnote 2, the defendants in that case argue these were filed rates and they should bar the discrimination claim. And in De Hoyos versus Allstate, this one isn't in the brief, but it's 345 F. 3rd. 290. In that case, it was a discrimination claim and in footnote 5, the court said essentially enforcing the federal discrimination laws doesn't supplant the filed rate. The idea is, if you look at, and they even admit, Your Honor, if you look at the statute that defines what is unfair discrimination, which is 2251.051, it lists three things, right? It lists not based on sound actual principles, doesn't bear a reasonable relationship or expected loss or expense among risks, and based wholly or partly on race, creed, color, ethnicity, or national origin, and those are separate, right? They admit in their briefing that they couldn't have a factor based on race. Legally, if they're, logically and legally, if they're correct in this case, if they decided to charge blacks more than whites for insurance, if the filed rate doctrine precludes us bringing the discrimination claim, we wouldn't be able to go to court on that claim. And that's what's been repeatedly rejected by the courts. Any claim that we were here challenging the reasonableness of the rates, any claim that we were challenging that the rates were too high, we would be barred, Your Honor. But we're not challenging the rates are too high. We're challenging that they are applying different rates for people for an improper purpose. So those claims aren't barred by the filed rate doctrine. It just doesn't reach it. You probably said this already, Mr. Coon, but your best cases that you would point to from Texas courts, what are those? I mean, well, the NRA Monumental. That was okay. Grigson from the district court, which actually deals with the same exact statute, and rejected the filed rate doctrine. I don't know off the top of my head other filed rate doctrine cases. Honestly, I mean, I mentioned the ones that are from around the country, but you asked Texas specifically.  And I think the answer is, Your Honor, these decisions get short shrift, because usually what happens is they make this argument and the court says, but that doesn't apply here, obviously, because we're not challenging the reasonableness of it. So, I mean, I think that the bar and the courts would welcome an opinion from this court that really spells out what is and what isn't covered by the filed rate doctrine. And clearly, a claim of discrimination, it can't be covered. If they're right, then a claim that, you know, in NRA Monumental, that blacks were charged more money and had worse benefits under the insurance policies, that would have been barred by the filed rate doctrine. What's the class of people they're discriminating against? Well, I mean, the class is people who have, I mean, when you say the class of people they're discriminating against, it's, the question goes to, and if I can, this kind of moves to that second issue about whether or not we have to show comparators. When we talk about class in this purpose, and Hank's opinion out of the Southern District of New York, I think has really good language. I cite it in the case, but I don't put the language in there. Basically, what it talks about is this statute bars discrimination or different rates that are intra-class discrimination. It doesn't differentiate, or it doesn't prohibit differential rates that are inter-class. So the question is, and what Hank talks about is, is it a legitimate basis to create a distinct underwriting class? So if you look at this court's opinion in Hope, right, what we said, what the court said was, the question was, could they distinguish people who had, could they make, could they break two separate classes based on people who had filed a higher number of claims in the past? Your rates, your claims may file, you know, file, is that a legitimate basis to make a distinction? And this court said it was. So the question is that what they're doing is they're taking people who have similar risk, and they are splitting them into different class and charging more to one than the other, even though there's no reasonable reason to do so. Every single person from Allstate testified that it is not a risk-based determination whether or not, essentially what they're asking, Your Honor, is who can we figure out, can we figure out who would give us more money? And they figured out that people will pay as much as 19 times more for insurance. And so what they did was through this scheme, they are charging people more money if you sign up for auto pay, if you're a long-time customer, if you have a, you know, single-time pay. They're identifying those people based on, you know, a very complicated system, which in the record they say not even maybe they can explain. But they're using the, admittedly, they're using your willingness to pay more money as opposed to switching carriers as a basis to change to charge more money. And that's the very evil the statute is trying to prevent. But they filed those rates with the Texas Department of Insurance. It's not unfiled. It's a filed rate, right? They disclosed what the rate is. Well, Your Honor, they don't, I mean, they didn't file the model. They didn't file this. It's an internal black box that they basically, when asked about it, said it's too complicated to show you. They filed, and this is where the district court got confused, the CGR factors, right, which is after the fact that they used to back into the number they wanted to get to. The way it worked was the rate was being set by an internal model. And then they filed CGR factors that, I mean, if you really, if you go through the back end process, I guess you could figure out what those rates might be individually. But they never told the agency what we're doing here is we're setting different premiums based upon people's willingness to pay. And that's the discriminatory conduct that we're challenging. And if they can do that under the statute, I mean, actual basis, risk basis is one in two of the statute. The last is race and national origin. There's no reason that the law should be any different from those. The whole point of the statute is to make sure you're charging people based upon the actual. So the Texas Department of Insurance doesn't know that they have this formula that includes a higher rate for people who are willing to pay it. The Texas Department of Insurance doesn't know that or they're not equipped to deal with that? I mean, why isn't that still a matter for agency review? Can I respond? Please, go ahead. Two things. On your did they know it, I think the answer is clearly no. They were never told this. And the thing that you can look at is in the record it's 15177. This is after this lawsuit was filed. They sent notice to them asking how does the filed rate plan, which is the SMR4, affect the quoted premium? And that's the first time they're told it doesn't, right, after the fact. Now, your second question about why isn't this an agency issue, it is both an agency issue and a court issue. I mean, it's not set up for you can bring a discrimination claim and it can be heard in either case. In fact, when the legislature adopted this statute and created a cause of action for you to go to court, the agency changed its internal, its administrative procedures to reflect that because it noted that now people could go to court. And historically, courts are better equipped. I mean, the agency is better equipped to make a determination of reasonableness. Courts are better equipped to make a determination of discrimination. Okay. Thank you, Mr. Kuhn. You've saved some time for rebuttal. Thank you. Mr. Kervin. Good morning, and may it please the court.  This is not a case of race discrimination? So, but you would agree, I would assume, that if it were a claim of race discrimination, charge one race, higher rates than others, the filed rate doctrine wouldn't bar that claim. Judge, I would not go that far. Really? And here's, yes, here's why. If the department, the anti-discrimination statute that counsel quoted that says the department or a rate filing can't discriminate on the basis of race, color, creed, national origin, or ethnicity. Right. The kicker is that that statute says, before listing those prohibited classes, it says the department shall disallow any rate filing that does that. And so as part of the department's review process, they are tasked with making sure that rate plans don't discriminate on the basis of race. And it's, the language is not permissive, it's mandatory. The legislature has told the department you shall disallow a plan that discriminates in that way. Okay, I thought, well you can respond to it, I thought counsel brought up a case from, I don't remember from Texas or not, maybe it was NRA, Monumental Life Insurance, that would seem to allow a race discrimination claim despite the filed rate doctrine. Is that not the case? That, that is one reading of that case. My understanding of that case is that you could adjudicate that claim without going into the reasonableness of the rate plan itself, which is, that's where you get into trouble. But just to be clear, there is no claim of race discrimination in this case. Well, yeah, I mean, everybody knows that. It's a different kind of discrimination case. But it's not based on any sort of prohibited characteristic. That's the issue. And again, if the department had identified any sort of discrimination on the basis of those prohibited classes, I'm confident the department would have disallowed it. But again, that's not, that's not this case. So what we have here is a classic case of the filed rate doctrine because they are challenging the reasonableness of the risk factors that Allstate included in its rate filings. And that squarely implicates the filed rate doctrine. If I could give another example about the race discrimination scenario, and this is, I think, the two text cases that they relied on in their briefing, Grigson and Lemony. In the Grigson case, there was an allegation that the insurance company there had two rate plans that had been approved by the department, one for new customers and one for renewal customers. And the allegation there was that they were discriminating against their existing customers by charge, by not offering them this other more favorable rate. And there the Grigson court considered the, and it was a discrimination claim. The customer said, we're being discriminated against by only being offered this one of two rate plans that produces a higher rate. And we think we should have been offered the other. And the court wrestled with the filed rate doctrine there. And what the court said, notably, the court did not say, well, the filed rate doctrine has no application to discrimination claims. What it said was that this discrimination can proceed because we don't have to delve into the actual merits of either rate plan. All we have to do is consider whether have people been discriminated against by being pushed into one rate plan other than the other. And you can do, that's the way of reconciling the filed rate plan with this anti-discrimination principle. And if I could give one other example in the race context. This is kind of a real world example. There are some insurance companies that do business in states. They may offer auto insurance with two different rate plans. One for, say, standard customers and one for what are called non-standard or higher risk customers. And the same company can have those two plans. They often do it under affiliates or whatever. But let's say that that insurance company was systematically pushing certain ethnic minority groups into the non-standard rate plan without, which produced higher rates and lesser coverages. That sort of discrimination claim can be proven consistent with the filed rate doctrine because the court there, the court isn't being asked to delve into the rate filings themselves. Rather, the discrimination there is in a business practice that is shifting between two rate plans. And so that's the way of harmonizing the filed rate doctrine with the anti-discrimination principle, I think. Here, by contrast, the whole point of this case is that they take issue, the appellants take issue with the rate filing that was filed with the Texas Department of Insurance that was reviewed back and forth in meetings over many months and was allowed to go forward by the department. And that is a classic example of what the filed rate doctrine says that courts shouldn't do. That's really the province of the TDI. Now let's focus, if I could, focus a little bit on this, the actual practice that they maintain as problematic. So in 2014, Allstate, and this is in our briefs, but I think it's important given the way the discussion has gone. When Allstate first filed its rate plan with the Texas Department of Insurance, the one that's at issue here, it had 39 risk factors. And the 39th was this retention characteristic. It's called comprehensive group rating, but I'm going to call it the retention models. And interestingly, even before Allstate filed that rate plan in early 2014, in late 2013, it sat down and had a meeting with the department. And it included a PowerPoint, and what Allstate was saying is, this is what we're planning to do with our next rate filing. We are going to include something called comprehensive group rating. And this goes to Judge Graves' question. This was plainly disclosed to the department. Even before the rate plan was filed, Allstate sat down with them, with the department, and said, we're going to include a 39th risk factor, and we're calling it comprehensive group rating. But what we're trying to do is estimate how sensitive certain customers are by class to price increases. In other words, we're going to calculate a range of premium rates that might be indicated, and we're going to try to estimate if the indicated rate is much higher than what the customer is currently paying, how should we phase in that price increase, basically? Because the goal is, Allstate doesn't want to lose customers. An overall goal of rate making is you've got to collect enough premiums to make sure that you can pay all your claims, pay your expenses, and yes, make a profit. And so a big challenge is when you're coming out with a rate plan, you don't want the rate to be so high or the increases so high that people drop their policies. That would be really bad for the overall book of business. It would be bad for the solvency of the book. It would jeopardize Allstate's ability to pay claims. And so the goal here is to figure out how sensitive customers are to price increases. I guess my reaction to that is when you say sensitivity to price increases, do you mean whether we can jack up their rates a little bit and they won't ditch us? No. It's just a meaner way of saying what you're saying. Well, let me give you an example using their own class analysis here. Their own expert concluded that approximately 15 to 16 percent of their purported class actually got premium increases at the low range of what the indicator rate was. So it's not the case that Allstate was maximizing the price that it could charge every customer. That just wasn't what's going on here. And let me add a bit of historical context. This is part of the rate-making process historically, and our expert explained this, but insurance companies have always considered the impact of price increases on their book of business. Because, again, you want to maintain a book of business that is robust enough to pay claims, pay expenses, and make a profit. And so in the past, before complex computing or sophisticated computing, actuaries would run their analysis and come up with what looked like a good premium, what the premium should be, and then the companies would also consider, okay, well, you may tell us that we can justify a 20 percent premium increase across the board, but if we do that, we're going to lose a lot of customers. And so in the past, these same judgments were made. They were called transition rules, our expert explained. But the only difference here is that now that we have the computing power that we have, Allstate decided to do that, to try to eliminate some of that subjectivity and come up with algorithms that could help it decide how much to increase or decrease premiums. And in particular, we're talking about existing customers, and the indicated rate suggests a premium increase. This algorithm was designed to help Allstate figure out how gradually do we move them to that higher rate that's indicated by the actuaries, basically. So, okay, I get what you're saying, algorithm. I mean, you can do pretty much anything with an algorithm these days. I mean, what if we had an algorithm that said, you know, if your immigration status, if you're an illegal alien, probably can charge you a little bit more, and we'd figure out an algorithm to figure that out. Is that? See, I'm backing back into the race and national origin discrimination. I get that, Your Honor. I would say two things. First of all, that would need to be, if that were going on, that would need to be disclosed to the regulators, and it would be incumbent on the regulators, I believe, to disallow that as being discriminatory or not actuarially related to the risk. What would have to be disclosed to the regulator? The algorithm or the purpose of the algorithm? Certainly the factors that go into the algorithm, I would think. So to put meat on the bones here, there's a suggestion that Allstate did not disclose this to the regulators. That is simply false. We have, if you look at the record in this case, you start at pages 11,900 and you go through pages 15,000. There's roughly 4,000 pages, and this is cited in our brief, but there is extensive back and forth about this very issue. Allstate, from the beginning, told the TDI, we're going to use retention models. To go to your example, Allstate also, at the very first meeting in 2013, before they rolled out this filing, they disclosed to the TDI, here are the four factors that we are going to use in our retention models. They were the date of birth of the oldest policyholder or the oldest driver, I believe the territory, where in the state of Texas the driver was, the gender of the oldest driver, and there was a fourth having to do with driving characteristics. So Allstate did the right thing. Allstate disclosed, here are the factors that we are using, the sub-factors that we are using to calculate this 39th risk factor. Now, the allegation is, if you really, their argument that we didn't disclose this to the regulators, again, we have 4,000 pages of back and forth between the regulators, Allstate. In some of the meetings, for example, Allstate sat down with the regulators, and the regulators had their own, or the TDI had their own expert actuaries there asking questions about these very retention models. So this was all out in the open. You can look at the paper trail, it was all out in the open. It certainly wasn't hidden at all. And the department, and another aspect is, the Texas Office of Public Insurance Council, which is a consumer watchdog agency, during this back and forth process, they actually raised their hand, they wrote to the department and said, hey, we think this is discriminatory. This very factor that we're here in court over, we think this is discriminatory, and it's not actuarially sound. The department asked Allstate, what's your response to that? And Allstate wrote back, and again, gave more, explained how the models work, explained what factors were considered and what factors weren't considered, and gave several examples, real world examples of how this would work. And after reviewing all that information, including with its own actuaries, the department allowed the plan to go forward, did not disallow it. So the department was satisfied that this plan was not unlawfully discriminatory. And we believe that the only way to adjudicate the claim that they bring is to open up that regulatory process and to try to come up with a different rate than what the department approved. Your argument is that whether this was discriminatory or not actuarially sound was already vetted. And that's why the filed rate doctrine is implicated. And if this were a case about business practices steering protected classes to one product or the other, that'd be different. Different case, yes. Because that is, again, this case squarely concerns what is and is not actuarially sound. You heard them argue that they don't think our factor 39 has anything to do with risk. We completely disagree with that. Our experts completely disagree with that. And that was a focus of the back-and-forth with the regulators. Was this a valid risk factor considered the way risk is understood in rate making? Was this factor number 39, was it valid to include? Well, I mean, without getting into too much detail, why is it relevant to risk number 39? Because the top-line risk with a rate filing is the overall amount of premium that has to be collected to be able to pay claims and to keep the company solid. Okay, so you don't mean risk as to a particular person's willingness to pay. Correct, but to the overall book of business. That's not relevant to risk. To the overall book of business, it's very relevant that you retain enough customers to pay claims. And that was part of the back-and-forth with the department that resulted in. If I could just turn briefly to class certification because this is a completely separate issue. We believe, we submit that the district court did not abuse its discretion in denying class certification here. And I'd like to focus just on my time remaining. We cover all the reasons in our brief. But I think it's important if we focus on the serious flaws in the damages model that the plaintiffs proffered in order to prove liability and damages on a class-wide basis. It was clear from the class cert hearing that the district court did a rigorous analysis as it was required to do under the Comcast case. And the district court properly concluded that the plaintiff's damages model was unreliable, seriously flawed, and did not fit their theory of liability as is required by Comcast. And the fit part is important because for several reasons, the district court found that the plaintiff's damages model was unable to isolate alleged harm to the class that was caused by this factor number 39. Again, there were 39 factors that went into the rate that they were charged. 38 of them are not at issue. They're only challenging number 39. And the district court found that their damages model was simply unable to isolate the harm caused by factor 39. And for that reason, it failed to fit their theory of liability as is required under Comcast. There were several other flaws with the damages model that they proffered. It failed to consider other factors that went into the rate calculation itself. They just ignored several of the factors that went into the rate calculation itself. And they also, the plaintiff's model, the district court specifically found, it attributed more in premium case increases to factor 39 than actually occurred in the real world. So, for example, their model produced numbers that were allegedly caused, the damages that were allegedly caused by factor 39 that we were able to show, those numbers were higher than the actual calculations that were actually passed on to policyholders. So the model was unreliable for that respect. It also, their model relied on theoretical premium calculations that were run very early in the rate setting process. And we were able to show that those did not match up to the real world premium ranges that were in fact calculated during the rate making process. And finally, their model failed to account for real world behavior by the plaintiffs. And this is illustrated just by one of the two named plaintiffs, Ms. Shannon. The plaintiff's expert calculated that she was damaged in the amount of $135 during one of the renewal periods when in fact we showed that her premium went down by $87 during that renewal period. And so even for just, I mean, we're talking about a class of more than a million class members potentially, and we have two named plaintiffs, and we were able to show that their damages model didn't even work for one of the two named plaintiffs. So the idea of extrapolating that around a class of a million people was something that the district court found just was unreliable, unsound, and couldn't be justified under the Comcast case. We have other arguments against class certification. They are laid out in the briefs. I guess the final point I would make is that the district court, this goes to the point, the district court concluded that their proof was also insufficient on the class basis because they were unable to show even a single instance of two comparably situated policyholders that were charged different premiums. We believe that is required by the plain language of the anti-discrimination statute. It would also point to the court, as we did in our briefs, to the Hogue case from this court in which the court affirmed a grand summary judgment for that exact reason. There the plaintiffs claimed discrimination, but they were unable to show that there was another customer out there who was similar to them that was charged a different premium. And this court held quite sensibly that if you look at the plain language of the statute, it requires proof of similarly situated customers who have similar risk and hazard profiles. You have to prove that there was someone at least in some way similar that was charged a more favorable premium. Thank you. Thank you. Thank you. We have your argument, Mr. Kerbin. Mr. Kuhn, you have four minutes for rebuttal. Your Honor, in terms of this argument that Griggs, I mean, that the, because the department signed off on it, we can't bring the claim. That argument has been rejected by the Texas legislature when it created the private cause of action because they knew these were rates that were filed. It was rejected by the Texas Department of Insurance, and we cited in our brief, it's the 20 Texas Registration 5614, when they modified their rule, and they did so specifically because they said there is now a private right of action for persons who violate this provision. And it was rejected specifically in Griggson, the one case that either side has cited that actually cites a case under this statute. When the district court accepted the magistrate's recommendation, he said that the insurance agent, the insurer had done a good job of explaining that the agency has a duty to look for this. That doesn't bar your right to bring a discrimination claim. If they're right, and my second point would be if they're right, there is no such thing as actuarial discrimination because we can't bring the claim if it's signed off on. And that's what, I mean, all the cases that we cite in the briefing about, you know, where they get in trouble for offering rebates to some customers, when they get in trouble for, you know, in Griggson it was two different, basically identical plans with different rates. And what the court said was one was offered only to new customers, and one was offered, a lower rate was offered to new than was offered to existing. That's discriminatory because it's not based on risk. That's exactly what we're arguing here. Now, their argument about the range, we address all the arguments we've made about the model and everything in our briefing. But the one thing I'll say about the range, right, the range, they say, and they've said repeatedly, they define for every single person a range of rates that are actuarially sound. And the question is where do they place individual people within that range? And what they're doing is they're charging more to people. I think it's in the consumer reports that's cited in the complaint, labeled it the suckers list. They're charging more money to people who will pay more without changing insurers. That's not based on risk. And that's what, that's the very evil the statute is intended to prohibit. And if we can't bring that claim, there's no distinction between that and any other claim that's listed under that. You know, we keep going back to the race claims because it's easy to understand and hard for them to explain compared to actuarial discrimination. It's the same exact statute. The question is are you going to say you can't do three but you can do one and two because that's their argument. Their argument is we can't discriminate against people based on risk because the agency let us do it. And, of course, we can't discriminate on race. But if they're right and the agency signed off, if we said, hey, we found out that Hispanics will pay more or undocumented immigrants will pay more for insurance than others will. And the insurance, you know, it's a file of use. So they didn't stop them from using it initially. You couldn't have a claim because once they stopped it, they would say, you know, it's no longer valid. But, you know, they would say we get to use it as long as we can. The last thing I just want to point out is this idea that they told them. Look at the slide that we put in our brief. This is the internal slide from 2014 when they told their own people what happens with renewal premium. Renewal premium determined by underlying rates. That's crossed out and it says no. That's what they say internally. Look at, if you look at 12-631 of the record, what they told the agency. The CGR process ensures identical risks are treated identically. Policies with the same risk characteristics receive the same rate. Any rate relative change as a result of CGR is cost-based and fair. We know that's not true. They didn't tell the agency what they're doing. They shouldn't be entitled to file right now. Thank you, Mr. Coon. Thank you, counsel, for a well-argued case. The matter is under submission.